18-CV-04910 (ALC)(GWG)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDGARDO DIAZ, Individually and on Behalf of
All Others Similarly Situated,

Plaintiff,

-against-

NEW YORK PAVING INC.

Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR DECERTIFICATION OF THE CONDITIONAL COLLECTIVE

**MELTZER, LIPPE, GOLDSTEIN**

**& BREITSTONE, LLP**

Attorneys for the Defendants
190 Willis Avenue
Mineola, N.Y.  11501

(516) 747-0300

Ana Getiashvili, Esq.

Christopher P. Hampton, Esq.

Larry R. Martinez, Esq.

Nicholas P. Melito, Esq.

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES…………………………………………………….... iii, iv

PRELIMINARY STATEMENT………………………………………………………1

STATEMENT OF FACTS………………………………………………………..2

    A.    Local 1010 Members are Subject to Different Employer Policies and Practices than Local 175 Members………………………………………………………3

    B.    Plaintiffs Were Involved in a Voluntary Carpooling Service That Was Never Mandated by Defendant………………………………………………...6

    C.    Plaintiff's and Opt-Ins' Schedules and Duties Varied…………...……………..7

ARGUMENT…………………………………………………………………11

    POINT I.    LEGAL STANDARD FOR DECERTIFICATION………….……….11

    POINT II.    NO COLLECTIVE CAN BE CERTIFIED HEREIN………….……….13

        A.    NY Paving Did Not Have a Common Policy that Required Plaintiff and Opt-Ins to Report to the Yard…………………...…13

        B.    Given There Was No Common Policy, The Individualized Inquiries Necessary to Determine Whether NY Paving Violated the FLSA as Against Each Individual Opt-In Preclude Collective Certification …………….…………………14

        C.    Plaintiff Cannot Establish an "Off-The-Clock" FLSA Overtime Claim on a Collective Basis as Matter of Law…..……16

        D.    Plaintiff Cannot Establish an "Off-The-Clock" FLSA Overtime Claim on a Collective Basis as a Matter of Fact………18

    POINT III.    TO THE EXTENT ANY COLLECTIVE CAN BE CERTIFIED, IT MUST BE LIMITED TO ONLY LOCAL 175, TO ONLY NON-FOREMEN, AND TO ONLY WORK PERFORMED PRIOR TO JUNE 2018……………………………………………………21

        A.    Foremen Cannot Be Included in any Collective…………………21

        B.    Unit-Members of Local 1010 Cannot be Included in any Collective………………………………………………...…22

i

C.    Individuals Employed Post June 2018 Cannot be Included in any Collective……………………………………………………………23

D.    Plaintiff's Claims Are Preempted by Section 301 of the Labor Management Relations Act to the Extent Plaintiff Seeks to Vindicate Rights Granted by a Collective Bargaining Agreement.................................................................................24

CONCLUSION……………………………………………………………..25

4831-8444-5689, v. 10

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Albrecht v. Wackenhut Corp.*,
  2009 WL 3078880 (W.D.N.Y. Sept. 24, 2009) ................................................................. 15, 17
*Colella v. City of New York*,
  986 F. Supp. 2d 320 (S.D.N.Y. 2013).................................................................................. 17
*Colon v. Major Perry Street Corp.*,
  2013 WL 3328223 (S.D.N.Y. July 2, 2013) ..................................................................... 22, 23
*Colozzi v. St. Joseph's Hosp. Health Ctr.*,
  595 F.Supp.2d 200 (N.D.N.Y.2009)..................................................................................... 20
*Conzo v. City of New York*,
  667 F. Supp. 2d 279 (S.D.N.Y. 2009).................................................................................. 18
*Cuaya v. VI Dev. Grp., LLC*,
  2020 WL 5494371 (S.D.N.Y. Sept. 10, 2020)..................................................................... 22
*Diaz v. Elecs. Boutique of Am., Inc.*,
  2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ..................................................................... 14
*Glatt v. Fox Searchlight Pictures, Inc.*,
  811 F.3d 528 (2d Cir. 2016)................................................................................................ 11
*Hoops v. Keyspan Energy*,
  822 F.Supp.2d 301 (E.D.N.Y. 2011) ................................................................................... 25
*Integrity Staffing Solutions, Inc. v. Busk*,
  135 S.Ct. 513 (2014)............................................................................................................ 16
*Johnson v. D.M. Rothman Co., Inc.*,
  861 F.Supp.2d 326 (S.D.N.Y. 2012).................................................................................... 25
*Julian v. MetLife, Inc.*,
  2021 WL 3887763 (S.D.N.Y. Aug. 31, 2021)........................................................... 15, 18, 20
*Nakahata v. New York-Presbyterian Healthcare System, Inc.*,
  2011 WL 321186 (S.D.N.Y. Jan. 28, 2011) ........................................................................ 25
*Romero v. H.B. Automotive Grp., Inc.*,
  2012 WL 1514810 (S.D.N.Y. May 1, 2012) ........................................................................ 24
*Scott v. Chipotle Mexican Grill, Inc.*,
  954 F.3d 502 (2d Cir. 2020)............................................................................................. 11, 12
*Tand v. Solomon Schechter Day School of Nassau County*,
  324 F.Supp.2d 379 (E.D.N.Y. 2004) ................................................................................... 25
*Urtubia v. B.A. Victory Corp.*,
  857 F.Supp.2d 476 (S.D.N.Y. 2012).................................................................................... 23
*Vecchio v. Quest Diagnostics Inc.*,
  No. 16 Civ. 5165 (ER), 2020 WL 5604080 (S.D.N.Y. Sept. 18, 2020) ...................... 11, 12, 13
*Virginia Dep't of Environ. Quality*,
  2021 WL 1845324 (E.D.Va., Apr. 6, 2021) ........................................................................ 14
*Warman v. Amer. Nat'l Standards Inst.*,
  193 F.Supp.3d 318 (S.D.N.Y. 2016).................................................................................... 19

iii

*Watson v. Richmond Univ. Med. Ctr.*,
 408 F.Supp.3d 249 (E.D.N.Y. 2019) ........................................................... 14
*Zivali v. AT&T Mobility, LLC*,
 784 F.Supp.2d 456 (S.D.N.Y. May 12, 2011) ............................................ 12

Statutes

29 U.S.C. § 185 ................................................................................................. 25
29 U.S.C. § 207(a)(C) ....................................................................................... 17
29 U.S.C. § 207(h) ............................................................................................ 18
29 U.S.C. § 216(b) ...................................................................................... 11, 17
29 U.S.C. § 254(a)(2) ....................................................................................... 16
sections 206 and 207 ........................................................................................ 17

Regulations

29 C.F.R. § 785.9(a) ......................................................................................... 16

iv

## PRELIMINARY STATEMENT

The Court must decertify the collective action previously conditionally-certified by Magistrate Judge Gorenstein pursuant to Section 216(b) of the Fair Labor Standards Act ("FLSA"). *See* ECF No. 45. This matter concerns a voluntary carpooling service in place for decades, wholly created and facilitated by unionized employees of New York Paving ("NY Paving" or "Defendant"), and about which Defendant never enacted any policy mandating any employee participate in same. Despite this, Plaintiff Edgardo Diaz ("Diaz" or "Plaintiff") alleges he should be compensated for participating in this service, simply because his unionized brethren (without authorization from Defendant) may have demanded he participate, or because he may have performed minimal un/loading of the carpool vehicle while participating in this service.[1]

For Plaintiff to recover under this theory, he must show: (i) Defendant knew or should have known Plaintiff individually believed he was required to arrive at NY Paving's Long Island City yard (the "Yard") to participate in this service; and (ii) Plaintiff performed compensable and more than *de minimus* work while participating. Further, to pursue this as a Collective under the FLSA, Plaintiff must show he is "similarly situated" to other Opt-in Plaintiffs ("Opt-Ins") ("Opt-Ins and Plaintiff together hereinafter referred to as "Plaintiffs") such that adjudication of his claims could "stand in" for the adjudication of the remaining Opt-Ins' claims. Plaintiff cannot satisfy his heightened burden in this regard, because, *inter alia*: (i) Defendant enacted no company-wide policy violative of the FLSA; (ii) to the extent Plaintiff could show Defendant personally violated the FLSA as against him, his personal experiences differed from other Opt-Ins; and (iii) there exists no common proof which Plaintiff could use to establish the scope of any of the non-compensated work allegedly performed "off-the-clock" in any event. Thus Plaintiff

---

[1] In sum, Plaintiff alleges Defendant required him to report to Defendant's facility both before and after his shifts to load necessary tools, and then be counted and driven to the location of his shifts, and that he was not paid for this allegedly required pre-/post-reporting, "off-the-clock" time. *See* ECF No. 1

cannot proceed on a Collective basis. Even if he could, any Collective would need to be limited to exclude: (i) Foremen; (ii) members of Local 1010, Highway, Road Street Construction, Pavers & Road Builders District Council ("Local 1010")[2]; and/or (iii) work performed after June 2018. That is because Foremen, members of Local 1010, and individuals who worked after June 2018 were subject to materially-different policies than Plaintiff, as Plaintiff never performed work as a Foreman, was never a member of Local 1010, and stopped working in 2017.

## PROCEDURAL HISTORY

On June 3, 2018, Diaz filed his Complaint asserting unpaid overtime under the FLSA and New York Labor Law. *See* ECF No. 1. On December 4, 2018, Magistrate Judge Gorenstein granted Diaz's request to conditionally certify an FLSA Collective Action, finding Diaz satisfied his "modest factual showing" at the first stage to issue notice. ECF No. 45. 105 individuals opted into this lawsuit. Defendant produced over 70,000 pages of records and the parties conducted 15 depositions. Discovery closed on June 30, 2021.

## STATEMENT OF FACTS

NY Paving provides asphalt and concrete paving throughout, *inter alia*, New York City.[3] Utility and other companies contract with NY Paving to fill holes in roads, sidewalks, etc. *Id.* NY Paving generally facilitates the provision of these services by creating "Routes" which consist of specific locations throughout New York City that must be paved daily. Miceli Dec. ¶ 7. The only information provided by NY Paving to the unionized employees performing the paving is the Route's first location and start time **on-location – not at the Yard**; NY Paving does not mandate

---

[2] As opposed to members of Construction Council Local 175, Utility Workers of America, AFL-CIO ("Local 175"), of which Plaintiff was a member.

[3] *See* the Declaration of Peter Miceli dated October 04, 2021 ("Miceli. Dec.") ¶ 4, annexed to the Affirmation of Nicholas P. Melito, Esq. dated October 5, 2021 ("Melito Aff."), Exhibit "A". Unless otherwise noted, all Exhibits are annexed to the Melito Aff.

4831-8444-5689, v. 10

that any specific employees handle specific Routes, or supervise the employees' arrival on-location for each Route. Miceli Dec. ¶¶ 8-9. As detailed below, such "micro-management" of Routes is performed exclusively by unionized employees in charge of the underlying work being performed.

A.     **Local 1010 Members are Subject to Different Employer Policies and Practices than Local 175 Members**

NY Paving has, at times relevant to this matter, contracted with two unions to perform its concrete and asphalt paving services: Local 175 and Local 1010. Miceli Dec. ¶ 6. Each union has distinct terms and conditions of employment, as governed by their respective CBA.[4] Local 175 unit-members perform exclusively asphalt-paving work, whereas Local 1010 unit-members perform primarily concrete repairs. *Id.* ¶ 13. Given this material difference, Local 175 members require different tools and materials than Local 1010 members.[5] In this regard, the Local 175 CBA only "covers" work concerning "Asphalt Installation ... Grounds Improvement, Utility, Paving and all Road Building Work" as expressly limited by "Article VIII" of said CBA. Ex. "B", Article II, p. 5. Local 175 members' duties are limited to: (i) asphalt paving, slurring methacrylate, resurfacing including sandblasting, chipping and scrapping, fence installation; (ii) asphalt restoration work; (iii) preparation and cleanup of all turf material; (iv) traffic safety maintenance for all work sites (including safety watchman); and (v) "General Construction work related to Asphalt paving." *Id.*, Article VIII, p. 9.

In contrast, the Local 1010 CBA covers substantially more work concerning "Site and

---

[4] See copies of the applicable Local 175 and Local 175 CBAs, annexed as Exhibits "B" and "C", respectively. Please note, NY Paving specifically disclaims it was bound by any CBA's other than those provided in Exs. "B" and "C" herein, and reserves all rights and defenses in connection therewith.

[5] See relevant portions of the Deposition Transcript of Patty Labate dated June 30, 2020 ("Labate Dep.") annexed at Exhibit "D", at 91:20-92:02; 107:06-108:08; 133:16-134:07; 136:02-139:05; 140:06-19; 143:04-08; 148:17-24; 152:02-04; 152:17-153:16; 154:13-25.

Grounds Improvement, Utility, Paving and Road Building Work" as comprehensively covered by "Article VI. Ex. "C", Article II, p. 3. This CBA includes but is not limited to performance of the following duties: (i) All paving work, regardless of the materials used; (ii) Asphalt paving "subsequent to subway, sewer, water main, conduit, power, communications and duct line construction"; (iii)"Production Paving" including all asphalt paving and asphalt restoration work; (iv) Paving removal/excavation/milling; (v) Installation of dowels, expansion joints, rubber/stamp sidewalks; (vi) Saw cutting; (vii) All concrete work; (viii) Road finishing, including pouring and finishing of steel and concrete curb; (ix) Unloading (but not loading) and carrying of materials; (x) Preparation, installation and removal of "Paving Block & Curb"; (xi) Landscaping incidental to paving; and (xii) Formsetting for all types of roadways, sidewalks, drive ways, etc. *Id.*, Article VI, p. 9-13. Thus the work "covered" by the Local 175 CBA is significantly more limited than the work "covered" by the Local 1010 CBA. This means the type of pre-/post-liminary work which could be integral to Local 175's primary duties is significantly more limited than they type of pre/post-liminary work which could be integral to Local 1010.[6]

Due to the differing scope of work and applicable policies, Local 175 members do not communicate with Local 1010 members regarding schedules, job duties, or pay.[7] Instead, NY Paving separates Local 1010 and Local 175 operations, with one supervisor monitoring work orders for Local 175 jobs, and a separate supervisor monitoring work orders for Local 1010. Miceli Dec. ¶ 14. Defendant's Local 175 supervisor individually communicates to Local 175

---

[6] Additionally, each CBA requires payment of "Premium Overtime" (payment of overtime wages for certain hours, even when the employee has **not** worked in excess of 40 hours per week). Indeed, both CBA's require payment of overtime for all work performed over eight hours per day, and all work performed on Saturdays; and require payment of **double time** for all work performed on Sundays and holidays. Ex. "C", Article VII, Section 6, p. 18; Ex. "B", Article IX, Section 4, p. 11. As detailed below, payment of Premium Overtime can offset ("cover") any potential overtime payments due and owing under the FLSA, and to the extent Premium Overtime offsets all overtime "off-the-clock" hours ostensibly owed, an Opt-In has no claim. *See* Argument Section II(c), *infra*.

[7] See relevant portions of the Deposition of Edgardo Diaz, dated July 23, 2020, ("Diaz Dep."), annexed at Exhibit "E", at 67:24-68:08.

Shop Stewards the Routes that need to be completed on a daily basis, with each Local 175 Shop Steward then having the responsibility to ensure these Routes are assigned to Local 175 asphalt crews. *Id.* Following such assignment, it is the responsibility of a crew's supervisor (a "Foreman") to ensure his Route is completed in a timely fashion. Robert Zaremski, NY Paving's former Operations Manager, was responsible for organizing the work orders for asphalt services and communicating with Local 175 Foremen/shop stewards to create Routes and crews.[8] Mr. Zaremski never made crews, or communicated with Local 1010 regarding concrete work orders. Zaremski Dep. At 100:15-19. Instead, that was the responsibility of Steven Sbarra and Louie Sarro, who organized work orders for, and communicated with, Local 1010 Shop Stewards to create Routes and crews.[9]

Importantly, Opt-Ins were assigned to work at NY Paving **by their respective union – not Defendant**. Diaz Dep. at 71:22-72:02. Once assigned to NY Paving, it was apparently the prerogative of the Local 175 business agent, **without authority from Defendant**, to inform the individual performing paving services (a "Laborer") to report to the Yard at 5:30 a.m. to speak with Local 175's Shop Steward (again not with a supervisor of NY Paving). Diaz Dep. at 72:01-07; Wolfe Dep. at 49:20-50:20. Upon arriving to the Yard, the union Shop Steward would assign the Laborer to a crew for the day. Diaz Dep. at 71:22-72:14; Wolfe Dep. at 73:07-18. At no point during the hiring or assignment process would a Laborer/Foreman communicate as to job duties/requirements with NY Paving management. Diaz Dep. at 73:06-74:06; Wolfe Dep. at 69:22-70:06. Thereafter, once a Laborer was assigned to NY Paving on a permanent basis, the

---

[8] *See, e.g.*, relevant portions of the Deposition Transcript of Robert Zaremski dated January 28, 2021 ("Zaremski Dep.") annexed at <u>Exhibit "F"</u>, at 100:09-14; relevant portions of the Deposition Transcript of Frank Wolfe dated July 8, 2020 ("Wolfe Dep.") annexed at <u>Exhibit "G"</u>, at 49:09-15.

[9] See relevant portions of the Deposition Transcript of Jose Alvarez dated January 12, 2021 ("Alvarez Dep.") annexed at <u>Exhibit "H"</u>, at 76:03-11.

4831-8444-5689, v. 10

respective union Shop Stewards/Foremen would communicate with each other (not NY Paving management) to place same on a crew. Diaz Dep. at 74:16-24. Local 175 Shop Stewards and/or Foremen only create the schedules and crews for Local 175 members, and Local 1010 Shop Stewards/Foremen only create the schedules and crews for Local 1010 members. Miceli Dec. ¶ 14. Once the schedules and crews are made, **Foremen** inform Laborers of same and instruct them on when and where to report to work. Wolfe Dep. at 73:07-18. NY Paving management never communicates with Laborers directly regarding scheduling and crews, instead only providing to Foremen the times a crew must be at the Route's first location. Diaz Dep. at 98:16-21.

Diaz worked selectively in 2016 and in 2017, exclusively as a member of Local 175. Diaz Dep. at 49:19-25. Diaz's crews always consisted of only Local 175 members. Diaz Dep. 68:24-69:02, 68:03-08, 84:14-17. While the vast majority of Opt-Ins work(ed) as members of Local 175, two (out of 105) are members of Local 1010. Miceli Dec. ¶ 33.

**B.**    **Plaintiffs Were Involved in a Voluntary Carpooling Service That Was Never Mandated by Defendant**

NY Paving services all 5 boroughs of New York City, and Laborers are required to work at – and travel to – multiple locations throughout the City every day. Miceli Dec. ¶¶ 4, 8. Previously, Laborers had to either drive their personal vehicles to each location during their shift (and find parking in New York City), or had to leave their personal vehicle at one jobsite and travel with other Laborers for the remainder of their day; this meant these Laborers would have to find a way to return to their personal vehicle after the last jobsite. *Id.* To alleviate all issues associated with driving around New York City (finding parking, leaving personal vehicles in public and well-traveled areas, etc.), Laborers began voluntarily meeting at the Yard in order to carpool from location to location in company vehicles. *Id.* This voluntary carpooling began in the 1990's

6

and continues to this day. *Id.*

NY Paving never codified this carpool to/from the Yard into any policy, never mandated any non-Foreman Laborer report to the Yard to participate in this carpooling service, and never mandated Laborers perform work in the Yard in connection with same. Diaz Dep. at 129:23-130:25.[10] Thus, to the extent Plaintiff (or any other Opt-In) believed they were required to report to the Yard to participate in this carpooling service with their assigned crews, such requirement was mandated by their union's business agents, Shop Stewards, or Foremen only. Wolfe Dep. at 68:16-18; Alvarez Dep. at 52:04-06. Importantly, some Opt-In Plaintiffs occasionally reported to the first jobsite and not the Yard. Wolfe Dep. 145:14-24 (discussing Opt-In Plaintiff Terry Holder's text message informing Opt-In Plaintiff Wolfe that he would be going straight to the jobsite instead of the Yard). There is no evidence that any supervisor or manager of Defendant actually mandated any non-Foreman Laborer ever report to the Yard, at any point in time. As such, Plaintiff's allegations that **NY Paving** required he report, or knew he was "reporting," to the Yard are flatly contradicted by the record.

### C.    Plaintiff's and Opt-Ins' Schedules and Duties Varied.[11]

First, to the extent any Laborers actually regularly reported to the Yard, the time they reported varied by position and on-location start time. Wolfe Dep. at 82:16-18, 83:19-23, 87:06-88:25. Generally, the start time **on location** for most paver's first Route locale is 7:00 a.m. Miceli Dec. ¶ 16; *see also* Labate Dep. 121:17-23. That being said, NY Paving also has crews who have start times beginning 8:00 a.m., 9:00 a.m., and even in the afternoon for overnight

---

[10] As detailed below, the only individuals required to report to the Yard were Foremen, and Foremen were compensated for such time. Indeed, NY Paving required **only** Foremen to report to the Yard and perform the work Plaintiff alleges all Laborers performed. Given NY Paving mandated this requirement on **only** Foremen (and knew Foremen could handle all tasks), NY Paving never knew that non-Foremen Laborers believed they also were required to report to the Yard in any event.

[11] This section only notes certain of the differences experienced by Opt-Ins. A more fulsome chart is at <u>Exhibit "I"</u>.

work as well. *Id.*; *see also* Wolfe Dep. at 144:02-04. Opt-Ins acknowledge such variable arrivals, and alleged they arrived two hours early for start-times beginning at 7:00 a.m., **but only one hour early for other start times** – this is because, since most start times began at 7:00 a.m., it could have taken longer for Opt-Ins to leave the Yard due to the congestion. Wolfe Dep. at 141:20-142:24, 175:08-176:13.[12] Thus Plaintiff's allegations that NY Paving required all Plaintiffs to arrive at the Yard at a "set" time is untrue.

Next, Plaintiffs acknowledge Foremen are subject to different requirements and compensation practices than non-Foremen. Only Foremen were required **by NY Paving** to arrive at the Yard in order to procure their Routes for the day, and only Foremen had to ensure their crew had all necessary tools and materials for their Routes.[13] *See also* Wolfe Dep. 67:11-19. Importantly, Foremen (and only Foremen) received additional pay for these responsibilities. Wolfe Dep. at 67:11-68:04; Alvarez Dep. at 40:19-25.

Deposition testimony also varied greatly with respect to reporting to the Yard **after** the last jobsite. Indeed, Local 175 Opt-Ins allege it would generally take them one hour to drive from the last jobsite to the Yard, including an alleged additional approximately 15 minutes to refuel the truck. Wolfe Dep. at 104:05-106:21.[14] Plaintiff testified he would have to unload all tools from the truck each day – despite also testifying that the same trucks, with the same tools, were used by the same crews each day. Diaz Dep. 79:11-25  Conversely, Local 1010 Opt-In Plaintiffs were

---

[12] Plaintiff and Opt-Ins for Local 175 also testified that crews assigned to jobsites in Staten Island would report to the Yard earlier than crews at other locations because the jobsites generally took longer to get to. *See* Diaz Dep. at 165:2-13.

[13] *See* relevant portions of the Deposition Transcript of Jose Gonzalez dated January 19, 2021 ("Gonzalez Dep.") annexed at <u>Exhibit "L"</u>, at 58:22-59:06; 59:20-60:06.

[14] The gas station to refuel the truck was within walking distance to the Yard. The gas station was full-service; thus, while the gas station attendant fueled the truck, the 3 to 4 crew members remained in the vehicle. Some days, members of the crew would walk to the Yard and leave while the driver of the truck refueled the truck. Wolfe Dep. 106:12-21. Once the truck was refueled, Local 175 Opt-In Plaintiffs testified that they would have to unload the garbage off of the truck – which took approximately 30 minutes. Diaz Dep. 90:03-07.

not required to return to the Yard or perform any work thereat after their shift; instead once the crew arrived at the Yard they simply went home. Gonzalez Dep. 70:16-71:02. As such, Plaintiff, who allegedly was required to return to the Yard after his shift, is not subject to the same policy as Local 1010 members, who were not.

Finally, there are factual differences between specific Local 175 crews as well. In this regard, despite Plaintiff and Opt-In Plaintiffs testifying only about 3 crew types, there are generally 5 types of asphalt-paving crews to which Local 175 Laborers and Foremen are assigned: (1) Top crew on small jobs; (2) Binder crew; (3) "dig out" crew; (4) Milling crew; and (5) large volume Paving crew. Miceli Decl. ¶ 15; *see also* Wolfe Dep. at 96:06-08. Top, Binder, dig out, Milling, and large volume Paving crews all use different tools because of the type of work they each conduct. Miceli Decl. ¶ 15; Diaz Dep. at 154:02-17; Wolfe Dep. at 98:07-25. Top crews need more tools and materials than Binder crews. Wolfe Dep. at 98:21-25. Binder crews place "binder" (rougher) asphalt inside the hole left by the utility company, while Top crews places finer asphalt on top of the filled hole to create the final finished surface on a street. Miceli Decl. ¶ 15. Dig out crews are responsible for digging up the asphalt for other crews to lay asphalt. *Id.* The Milling crew and Paving crew consist of two different crews that go to the jobsite together. *Id.*; Wolfe Dep. at 99:11-16. A Paving crew generally uses more tools than a Top crew as they perform large volume work; thus, they use machine rollers, not manual rollers. Miceli Decl. ¶ 15. The Milling crews need different tools altogether not needed by Paving crews – jackhammers and bits, hoses, tape, spray paint, brooms, and shovels (as they are cutting the road to remove the old asphalt). Wolfe Dep. at 99:11-100:05; Diaz Dep. 123:04-09 (noting not every crew needs a jackhammer). Thus, the type of crew to which a Local 175 Laborer was assigned determined the tools "integral" to work, and the amount of time it could take to load same into the truck in the

9

morning, and/or unload in the afternoon. Diaz Dep. 177:20-178:02 (testifying that Binder crews needed to get to/leave the yard earlier).

While Plaintiffs generally testified it took approximately 30 minutes to load the trucks regardless of the crew, it is important to note **no Laborer or Foremen ever performed any duties for that entire 30 minutes**. For example, on a Top crew, usually 3 to 4 people were assigned. Wolfe Dep. at 66:15-18; Alvarez Dep. at 55:12-25. In contrast to Plaintiff's allegation that tools needed to be un/loaded every day, other Opt-Ins noted they would simply "scan the truck" to see if any tool was missing from the previous shift or if they needed any additional materials. Wolfe Dep. at 84:14-85:02.[15] Once it was determined that the truck needed extra equipment or materials, each individual would get **one and only one** respective item. Wolfe Dep. at 85:03-12. Additionally, some Laborers would arrive at the Yard prior to the rest of their crew and commence loading the vehicle, and would finish all loading prior to the rest of the crew's arrival at the Yard. Alvarez Dep. at 57:12-59:02. Thus, Opt-Ins acknowledge they spent the majority of their time at the Yard resting in the truck waiting for the appropriate time to leave so as to be at the first paving location on time. Wolfe Dep. at 85:03-12. Plaintiff's allegation that all Laborers generally un/loaded the same or substantively identical tools and materials on a daily basis also finds no support in the record. Based on the foregoing, and as reflected in the Chart summarizing the discrepancies in Plaintiffs' purported time worked "off-the-clock" (Ex. "I"), Plaintiffs are not similarly situated with respect to material issues of fact.

As a final matter, beginning in June, 2018, NY Paving instituted a materially distinct pay policy applicable to Laborers, whereby it began compensating the non-Foremen Laborers who

---

[15] Some Laborers actually locked their work trucks to prevent any other employee from taking tools off of it in order to eliminate the time spent "scanning" the truck for missing tools. Alvarez Dep. at 56:15-57:08.

were driving the carpool vehicles from the Yard to the work locations, and vice versa.[16] As noted above, Named Plaintiff performed no services beyond 2017, and thus was never subject to this materially distinct policy which arose in 2018.

## ARGUMENT

### I.   Legal Standard for Decertification

An FLSA Collective Action can be maintained only on behalf of the named plaintiff and alleged employees who are "similarly situated." *See* 29 U.S.C. § 216(b). The Second Circuit has approved a two-step procedure to determine whether opt-in plaintiffs are similarly situated to the named plaintiff. *Vecchio v. Quest Diagnostics Inc.*, No. 16 Civ. 5165 (ER), 2020 WL 5604080, *10 (S.D.N.Y. Sept. 18, 2020) (*citing Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 515-16 (2d Cir. 2020)). During the initial stage of certification, the named plaintiff must make only a "modest factual showing that they and others together were victims of a common policy or plan that violated the law." *Id.* (citing *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016)). That "modest factual showing" is heightened during the final certification stage, as, "[i]n the final decertification phase, the court reexamines the collective after the benefit of discovery and makes a final ruling on whether the collective is in fact similarly situated to the named plaintiff." *Vecchio*, 2020 WL 5604080 at *10 (internal citations omitted). "If the [named] plaintiff[] fail[s] to meet [this more stringent] burden, then the opt-in plaintiffs are dismissed without prejudice from the lawsuit." *Id.* Named plaintiffs face such burden because, to the extent they are similarly situated, the Court can substitute adjudication of their claims for that of opt-in

---

[16] *See* the Joint Stipulation between the Parties dated May 26, 2021 ("2021 Stipulation"), Exhibit "J", ¶ 3, 7 (noting that NY Paving instituted a policy to demarcate who drove and loaded the vehicles with "TT" and "ST" designations, respectively on payroll records); *see also* a representative sampling of payroll records, Exhibit "K" (noting "TT" ("Travel Time") designations indicating one hour of pay per day at the applicable minimum wage rate and "ST" ("Setup Time") designations indicating an additional half-hour of pay per day at the applicable minimum wage rate).

plaintiffs and feel confident that any result received by a named plaintiff applies to opt-ins. *Cf. Zivali v. AT&T Mobility, LLC*, 784 F.Supp.2d 456 (S.D.N.Y. May 12, 2011) (decertifying collective where "it would be [im]possible to generalize [named plaintiff's facts] across the 4,100 opt-in plaintiffs in this case").

Prior to *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502 (2d Cir. 2020), courts used an "*ad hoc*" approach at the final stage to consider three factors to determine if opt-in plaintiffs were similarly situated to named plaintiff: "the (1) disparate factual and employment settings of the plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against collective action treatment." *Zivali.* 784 F.Supp.2d at 460 (S.D.N.Y. 2011). *Scott* found, while the burden for final collective certification was higher than during conditional certification, the district court should not have applied the level of scrutiny analogous to Rule 23 class actions. Instead the Court should have solely determined whether plaintiffs were "similarly situated," defined to mean "that the named plaintiffs and opt-in plaintiffs are alike with regard to … material aspect[s] of their litigation." *Scott*, 954 F.3d at 516. The court found that such similarities must be "with respect to an issue of law or fact material to the disposition of their FLSA claim." *Id.* at 516 n.4.

In *Vecchio*, the court followed the guidance of *Scott* by focusing their analysis on whether the plaintiffs proved they were materially similar in both law and fact. *See Vecchio*, 2020 WL 5604080 at *11 (also noting that the *ad hoc* approach contains the same analysis) (*citing Scott*, 954 F.3d at 524). *Vecchio*'s analysis is particularly instructive as it used the *Scott* principles to analyze the exact claim raised herein – namely whether named plaintiffs and opt-in plaintiffs were similarly situated with respect to their "off-the-clock" overtime claims. *Vecchio*, 2020 WL 5604080 at *1. In *Vecchio*, the plaintiffs and opt-in plaintiffs worked as mobile medical

examiners who traveled to patients' homes. *Id.* The *Vecchio* plaintiffs alleged they were required to work "off-the-clock" as the defendant instructed them to only report the time spent performing the exam, not the time doing administrative work pre and post appointments. *Id.* at *2.

During discovery, the *Vecchio* opt-in plaintiffs' testimony varied with respect to the time it took to perform exams: for some plaintiffs, it took between 5 and 10 minutes, while for others it took between 30 and 40 minutes. *Id.* at *4. Additionally, the travel time and pre-/post-exam administrative work varied amongst plaintiffs and opt-ins depending the day. *Id.* Applying *Scott's* clarified standard for decertification, the *Vecchio* court granted the defendants' motion to decertify the collective. In doing so, the Court specifically held: (i) plaintiffs failed to show that the "off-the-clock" work was in fact **a collective-wide policy**; and (ii) since the job responsibilities (and time to complete same) were so different, the Court could not calculate the "estimated" hours worked "across the collective," and would instead need to do so on an individualized basis. *Id.* at *12. Due to similar factual and legal dissimilarities present here, this Court should decertify the Collective.

## II.   No Collective Can Be Certified Herein

### a.   NY Paving Did Not Have a Common Policy that Required Plaintiff and Opt-Ins to Report to the Yard

The Parties agree: there was no overarching policy, procedure or plan enacted by NY Paving which required Laborers to report to the Yard and/or perform compensable work thereat. Indeed, Plaintiffs uniformly testified NY Paving management **never** told them to report to the Yard prior to the first jobsite or after the last jobsite. Diaz Dep. 71:22-72:07, 130:19-25; Wolfe Dep. 49:23-50:05; Alvarez Dep. 52:04-06; Gonzalez Dep. 52:17-25. They also universally testified that it was only their union business agent, Shop Steward, and/or Foremen who instructed them to report to the Yard prior to the first jobsite – never NY Paving. *Id* As such, Plaintiff and Opt-Ins

could not be subject to any common policy by their employer requiring them to work "off-the-clock" at the Yard prior to the first jobsite or after the last jobsite, because all Plaintiffs agree their employer enacted no such policy. Thus, this case must be decertified. *See, e.g.*, *Abe. v. Virginia Dep't of Environ. Quality*, 2021 WL 1845324 (E.D.Va., Apr. 6, 2021) (granting decertification under the *Scott* standard because, *inter alia*, given no common policy applied to all plaintiffs, individualized inquiries as to whether defendant violated the FLSA against each plaintiff prevented certification); *Diaz v. Elecs. Boutique of Am., Inc.*, 2005 WL 2654270, *4 (W.D.N.Y. Oct. 17, 2005) (finding collective certification inappropriate where the evidence adduced in support of same was "insufficient to suggest that all [plaintiffs] were subject to a [common] policy" which violated the FLSA).

> b. Given There Was No Common Policy, The Individualized Inquiries Necessary to Determine Whether NY Paving Violated the FLSA as Against Each Individual Opt-In Preclude Collective Certification

Plaintiffs were not subject to any common policy enacted by their employer, and the very nature of their "off-the-clock" allegations require individualized inquiries into the facts applicable to each in order to determine whether any overtime violation occurred. In this regard, each non-Foreman Laborer must first prove that NY Paving had actual or constructive knowledge that they were required to report the Yard. This means they must show that management at NY Paving (not non-managerial union agents) knew the Laborers themselves were reporting to the Yard, and knew they were doing so not to take advantage of the carpool service being offered, but instead because they believed NY Paving required them to do so. *See Watson v. Richmond Univ. Med. Ctr.*, 408 F.Supp.3d 249, 270 (E.D.N.Y. 2019) ("To establish liability under the FLSA … a plaintiff must prove that she performed work for which she was not properly compensated, and that the employer had actual or constructive knowledge of that work."). This would require an individualized review of who relayed the "requirement" to the

14

report to the Yard to each Plaintiff, which managers/supervisors at NY Paving witnessed each Plaintiff report to the Yard, and how such managers/supervisors could know each Plaintiff was reporting because they believed they were obligated to do so. Such individualized inquiries prevent collective certification as a matter of law. *See Julian v. MetLife, Inc.*, 2021 WL 3887763, *3-4 (S.D.N.Y. Aug. 31, 2021) (decertifying collective under the *Scott* standard where "disposition of each [p]laintiffs' FLSA claims [would] depend on evidence that is not common to the collective, i.e., [p]laintiffs' … evidence regarding their individualized circumstances and how they completed their day-to-day tasks at [employer].")

Following same, each Plaintiff must establish what time they arrived at the Yard, particularly in light of the differing start times, differing locations, differing crews, and differing work performed by said crews, which occurred daily. Next, each individual Plaintiff would have to establish what duties (if any) they individually performed while at the Yard each day. Such establishment would be needed to show that such duties were "essential and integral" to their jobs, and not *de minimus* in nature – that is because only non-*de-minimus* work which is essential is compensable as a matter of law. *See Albrecht v. Wackenhut Corp.*, 2009 WL 3078880 (W.D.N.Y. Sept. 24, 2009) (finding no FLSA violation where the work allegedly not compensated was *de minimus* in nature). Finally, and assuming an Opt-In could establish that NY Paving knew they were reporting to the Yard out of obligation and that the duties they performed thereat were compensable, they would then need to show that those "off-the-clock" hours resulted in: (i) the specific Opt-In working more than 40 hours per week; and (ii) (as detailed below) that same Opt-In not receiving sufficient overtime pay to "cover" the additional overtime hours per week – this is because Plaintiffs received Premium Overtime pay due to CBA obligations. Ex. "A", Article VII, Section 6, p. 18; Ex. "B", Article IX, Section 4, p. 11

(providing for payment of at least time-and-one-half on Weekends, Holidays, and days where Laborers worked more than 8 hours); *see also* Ex. K, NYP000064, NYP000081, NYP000118, NYP000170, NYP000293, NYP000403, and NYP000426 (showing payment of Premium Overtime). Thus, each Opt-In would need to go day-by-day and establish the foregoing for each week, in order to establish any liability for any one week, and thereby resolve their claims.

c. Plaintiff Cannot Establish an "Off-The-Clock" FLSA Overtime Claim on a Collective Basis as a Matter of Law

FLSA regulations provide a "workday" consists only of the period between the time "at which [an] employee commences (his) principal activity or activities" and "at which he ceases such principal activity or activities." 29 C.F.R. § 785.9(a). The Supreme Court "has consistently interpreted the term principal activity to embrace [only] activities which are an integral and indispensable part of the principal activities." *Integrity Staffing Solutions, Inc. v. Busk*, 135 S.Ct. 513, 517 (2014). More importantly, the Portal-to-Portal Act amended the FLSA to specifically provide that "activities which are preliminary to or postliminary to [an employee's] principal activity or activities . . . which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases," are not compensable as a matter of law. 29 U.S.C. § 254(a)(2).

Thus, prior to calculating the amount of time spent performing pre-/post-liminary work in order to determine the amount of compensable time allegedly owed, the Court must first find that the actual pre-/post-liminary work performed by each individual Opt-In was "integral and indispensable" to their primary duties. *Integrity Staffing Solutions, Inc.*, 135 S.Ct. at 517. Only if the Court determines that the pre- and/or post-shift duties were "integral and indispensable" can the Court then determine whether the time spent performing these duties was more than *de minimus*. That is because work that is not more than *de minimus* is not compensable as a matter

16

of law, regardless of whether same was integral and indispensable. *Albrecht*, 2009 WL 3078880. Courts review three factors when determining whether otherwise compensable time should be deemed *de minimus*: (1) the practical difficulty of recording the additional time; (2) the size of the claim in total; and (3) whether the work was performed regularly. *Colella v. City of New York*, 986 F. Supp. 2d 320, 343 (S.D.N.Y. 2013). In order to make a determination that the work performed was compensable because it was not *de minimus*, the Court thus would need to do an individualized inquiry into the specific work done be each Opt-In on a day-by-day basis, in order to assess these factors for that work.

However, that does not end the inquiry. That is because, even assuming *arguendo* that the Court found the time spent by individual Plaintiffs at the Yard could be integral and not *de minimus*, the Court would need to undertake additional individualized inquiries to find the failure to pay same to be violative of the FLSA. Pertinently, the Court would then need to determine whether the purported extra time worked resulted in each individual Opt-In working in excess of 40 hours for a specific workweek. Should the individual Opt-In have worked less than 40 hours in a week even when including the "extra" "off-the-clock" work, that individual Opt-In still would not have a valid overtime claim.[17] *See, e.g.*, 29 U.S.C. § 207(a)(C) (noting that FLSA only protects claims of overtime for hours worked over 40 per week); 29 U.S.C. § 216(b) (limiting recovery under the FLSA to minimum wage and overtime claims under sections 206 and 207 respectively). Additionally, if the "off-the-clock" work actually resulted in an Opt-In working more than 40 hours per week, the Court could **still** find an Opt-in has no overtime claim. That is because the Court would need to determine whether the Premium Overtime paid to that Opt-In

---

[17] There were weeks when Plaintiffs only worked 1 to 3 days. Thus, even crediting Plaintiffs the full amount of hours alleged to have worked "off-the-clock," it would not result in them working over 40 hours for the workweek. *See* <u>Ex. "K"</u>, NYP007705, NYP008188, NYP008734, and NYP009509 (showing work of 3 days or less).

under the respective CBA's terms offset potential overtime owed under the FLSA. In this regard, if an employer pays a "Premium" (*i.e.*, at least one and one-half times the regular rate of pay) for hours worked below 40 per week, such payment can be used to satisfy the overtime pay requirements applicable to any hours allowed to be worked above 40 per week. *See* 29 U.S.C. § 207(h); *see also Conzo v. City of New York*, 667 F. Supp. 2d 279, 290-91 (S.D.N.Y. 2009) (holding that offsetting premiums paid towards minimum wage and overtime compensation is calculated on a week-to-week basis). Thus, should the Premium Overtime paid for hours worked below 40 cover all monies purportedly owed for any overtime hours worked over 40 per week, then that respective Opt-In still would not have an overtime claims under the FLSA.

In sum, there are several material individualized inquiries into the facts surrounding each individual Opt-In's workday and overtime premiums owed/received necessary to determine whether any can individually prove a violation of the FLSA as noted above. These include whether: (i) the time spent "off-the-clock" at the Yard was integral and indispensable; (ii) the work performed at the Yard was not *de minimus*; (iii) such work resulted in any Opt-In working over 40 hours in a workweek; and (iv) their Premium Overtime payments for work performed under 40 was insufficient to offset any and all purported overtime pay owed. These legal differences – along with the factual differences and disparate defenses available to NY Paving as detailed below – show that the Court should decertify the collective. *See Julian*, 2021 WL 3887763 at *3-4.

d. <u>Plaintiff Cannot Establish an "Off-The-Clock" FLSA Overtime Claim on a Collective Basis as a Matter of Fact</u>

Pertinently, the type of crew a Laborer was assigned to is critical in determining the type and

amount of tools needed.[18] For example, Top crews need more tools than Binder crews since Binder crews performs temporary "patch" work in addition to permanent work. Wolfe Dep. 98:21-25. Additionally, Milling crews use completely different tools than Top and Binder crews since Milling crews do demolition. Wolfe Dep. 99:11-25. Thus, Milling crews need demolition tools such as jackhammers, hoses, jackhammer bits, tape and spray paint; whereas other crews do not, and instead only need tools to pour/finish asphalt. Wolfe Dep. 99:11-25; Diaz Dep. 123:04-09. Paving crews need different tools than top crews and binder crews since they are responsible for large volume work; not smaller jobs which only require hand tools like top and binder crews. Miceli Decl. ¶ 15. Importantly, Plaintiff concedes the "pre-paving" tasks he allegedly performed on a "daily basis" (*see* Compl. ¶¶ 20-22, 23) he actually may have performed **only once** during his employment. Diaz Dep. 154:02-17.[19]

To the extent a paver was un/loading tools not necessary for the job they were performing, then they were not performing any duties "integral and necessary" for their actual job that day. Thus, in order to find any violation for failure to pay for un/loading times, the Court would need to do an individualized inquiry as to what duties each Plaintiff was performing per day, what tools were integral to perform those duties, and what tools were actually un/loaded in connection therewith. Individualized inquires such as these prevent certification as a matter of law. *See Warman v. Amer. Nat'l Standards Inst.*, 193 F.Supp.3d 318, 323 (S.D.N.Y. 2016) (finding that issues in connection with, *inter alia*, individualized inquiries prevented conditional certification).

Additionally, testimony reveals that the **amount** of time un/loading as noted above directly depended on the time at which Laborers were required to be on-location. In this regard, Plaintiffs

---

[18] This memorandum reviews only a few of the salient factual distinctions experienced by Plaintiffs herein. A fulsome review of all material factual distinctions as between each Opt-in Plaintiff can be found at Ex. "I".

[19] Thus Plaintiff's own sworn declaration and Complaint contain exaggerated and misleading statements pertaining to the amount of duties he – or any other paving Laborer or Foreman – allegedly performed daily at the Yard.

testified that the majority of their time at the Yard was waiting in lines for the tool shed or to leave the Yard due to the amount of "traffic" as most crews had a 7:00 a.m. start time. Ex. "I". Thus, when Plaintiffs worked on a crew which had a 7:00 a.m. start time, they allegedly reported to the Yard 1.5 hours prior (*i.e.*, 5:30 a.m.). Diaz Dep. 90:08-10; Wolfe Dep. 49:18-22; Alvarez Dep. 39:25-40:03; Gonzalez Dep. 53:03-19. However, crews on that same day (which also consist of Opt-Ins) that had a later start time (such as 8:00 a.m. or 9:00 a.m.), or worked overnight shifts, testified that they would generally get to the Yard no more than 1 hour prior, as there was less people there and, thus, less lines/traffic. Diaz Dep. 178:03-179:05; Wolfe Dep. 142:02-24. Finally, crews that worked on weekends or holidays arrived to the Yard no more than 1 hour prior to the start time for the jobsite. Diaz Dep. 165:14-24, 178:19-179:04. Further, not all putative members of the Collective worked weekends or holidays. Ex. "L", NYP008188 (showing work on non-holiday weekdays only). As Plaintiffs worked different start times throughout their employment with NY Paving, it is impossible to provide a common calculation across the collective to determine the amount of "off-the-clock" hours worked collectively.

In sum, there are several material individualized inquiries necessary to determine whether and to what extent any Plaintiff is owed compensation for "off-the-clock" work: who (if anyone) from NY Paving management knew or should have known they were "working"; what day of week each Plaintiff worked; what start time they had on such day; what type of crew were they on; what type of tools/materials were needed for that crew; what work they performed when at the Yard; how much work they performed when at the Yard; etc. All of these individualized inquiries mandate decertification. *See, e.g., Julian*, 2021 WL 3887763, *3; *Colozzi v. St. Joseph's Hosp. Health Ctr.,* 595 F.Supp.2d 200, 207 (N.D.N.Y.2009) ("I reject the existence of the break deduction policy practiced through Kronos, standing alone, as being sufficient as a common

denominator to permit a collective action on behalf of all of defendants' hourly employees subject to that practice, since something more is required in order to establish that the putative class numbers were all subject to the same unlawful practice.").

**III.   To the Extent Any Collective Can Be Certified, It Must Be Limited to Only Local 175, to Only Non-Foremen, and to Only Work Performed Prior to June 2018**

Even if Plaintiffs could establish entitlement to a collective, though, such collective must be limited to only individuals who are "similarly situated" to Plaintiff – *i.e.* to other individuals who were unit-members of Local 175, who never acted as Foremen, and who were never compensated for their "driving" time beginning in 2018.

a.   Foremen Cannot Be Included in any Collective

Plaintiff never worked as a Foreman during the course of his employment with NY Paving, and was not subject to the materially different policies applicable to Foremen. Diaz Dep. 50:02-05. Thus, Plaintiff cannot establish that he is similarly-situated to Foremen sufficient to encapsulate same in any Collective attempted to be certified herein. Indeed, ample testimony shows that Foremen's responsibilities pre-/post-shift differed than those of Plaintiff. First, some Foremen were assigned their own personal trucks that they drove to and from their home. Miceli Dec. ¶ 31. Thus, after the last jobsite, Foremen who personally used a company vehicle went home. *Id.*, Labate Dep. 189:13-21. Second, regardless if they were assigned a company vehicle to take to and from home, Foremen were compensated an extra hour's pay each day – oftentimes at the applicable overtime rate – for their administrative/Yard duties (*i.e.*, creating crews, loading tools, and obtaining paperwork for the daily jobsites). Gonzalez Dep. 73:15-22.

Further, Foremen generally arrived earlier to the Yard than Laborers to retrieve Routes and ostensibly ensure all tools and materials were already on the truck prior to laborers arriving at the Yard. Gonzalez Dep. 58:22-59:06, 59:20-60:06, Wolfe Dep. 67:11-19. To the extent Foremen

4831-8444-5689, v. 10

timely and dutifully fulfilled all these duties, the Laborers on their crew for these days did not perform any work at the Yard. Thus, Plaintiff – whom NY Paving never required report to the Yard, and whom NY Paving never compensated for such "reporting" time in any event – is not similarly situated to Foremen who otherwise did; as such if any collective is certified, it must exclude Foremen. *See Cuaya v. VI Dev. Grp., LLC*, 2020 WL 5494371, *5-6 (S.D.N.Y. Sept. 10, 2020) (excluding employees outside of kitchen staff from collective due to plaintiff's failure to establish that such employees were subject to the same policy as kitchen staff).

    b.  <u>Unit-Members of Local 1010 Cannot be Included in any Collective</u>

This matter must also be decertified to exclude Opt-Ins who were members of Local 1010, as opposed to Local 175. Given the disparate duties and distinct employer policies as provided for in the differing CBAs applicable to same, Local 1010 Opt-Ins cannot be alike to Local 175 Opt-Ins with respect to the material facts necessary to prove their individualized claims. Stated differently, since Plaintiff (exclusively a member of Local 175) was subject to distinct duties/employer policies from Opt-Ins who were exclusively members of Local 1010, the facts and law necessary for Plaintiff to prove his claims are not commonly applicable to Local 1010.[20]

As detailed above, the Local 175 CBA and Local 1010 CBA imposed different duties and policies upon collective members.  Courts routinely find that such disparate duties and policies – including the existence of potential individualized defenses in connection with same – eviscerate the right to proceed as a Collective action, even at the more modest initial certification stage. *See, e.g., Colon v. Major Perry Street Corp.*, 2013 WL 3328223 (S.D.N.Y. July 2, 2013) (denying certification for maintenance workers in light of the different duties and responsibilities

---

[20] Additionally, to the extent Plaintiffs seek to have pre-/post-liminary work compensated at wage-rates found in their CBA's (as opposed to the minimum wage rate otherwise only required by the FLSA), such claims are preempted by the Labor Management Relations Act ("LMRA") and/or National Labor Relations Act ("NLRA").

applicable to maintenance works as opposed to superintendents); *Urtubia v. B.A. Victory Corp.*, 857 F.Supp.2d 476, 484 (S.D.N.Y. 2012) (limiting conditional certification to a class of "waiters, food runners, bussers and dishwashers," as opposed to all "kitchen staff" because plaintiff could not establish he was similarly-situated to said staff regarding the hours, duties and compensation of other staff and delivery persons).

Local 175's CBA concerns a different scope of work than the Local 1010 CBA, in that it provides for sufficiently more limited duties "covered" by same. *See* Statement of Facts, Section A, *supra*. Thus, Defendant has significantly more factual and legal defenses to argue that any alleged pre-/post-liminary work performed by Local 175 Plaintiffs was not integral and indispensable to their work, then they do as against Local 1010 Opt-Ins. For instance, Local 1010 employees are required to perform tasks such as sawcutting and paving excavation, whereas Local 175 unit-members are not. *See id.* Thus, it is much less likely that a Local 175's alleged loading and/or fueling of machine tools necessary for sawcutting and excavation (such as power saws and grinders) could be considered integral to the duties performed by Local 175 members, when compared to the duties of Local 1010 members. Given the time and tools needed to perform concrete work as opposed to asphalt, Local 1010 collective members cannot be alike with respect to the material facts necessary to adjudicate their claims as Local 175 members. As such, the current collective conditionally certified must be decertified, at least as it pertains to Local 1010 members. *See, e.g.*, *Colon*, 2013 WL 3328223; *Urtubia*, 857 F.Supp.2d at 484.

c.   Individuals Employed Post June 2018 Cannot be Included in any Collective

Additionally, Plaintiff Diaz only worked selected dates in 2016 and 2017. Diaz Dep. 49:11-25. In or around June 2018, NY Paving instituted a policy to compensate non-Foremen Laborers who drove the carpool vehicle an extra hour-and-one half's pay at minimum wage for such

driving/un/loading time.[21] Joint Stipulation, ¶¶ 3,7; Labate Dep. 255:03-256:04.  Since Plaintiff

Diaz did not work during this time period and was not subject to this policy, Plaintiff Diaz is not

similarly situated to any Opt-In who did. *See Romero v. H.B. Automotive Grp., Inc.*, 2012 WL

1514810, *8 (S.D.N.Y. May 1, 2012) (denying certification where named plaintiff could not

show he was "similarly situated with respect to his job duties/requirements, compensation, **and**

**employer policies**" as other putative collective members (emphasis added)). As such and at the

very least, the Court must limit any collective-certification to exclude any work performed post-

June 2018.

    d.  <u>Plaintiff's Claims Are Preempted by Section 301 of the Labor Management Relations</u>
<u>Act to the Extent Plaintiff Seeks to Vindicate Rights Granted by a Collective</u>
<u>Bargaining Agreement</u>

Finally, Plaintiffs seeks compensation for their pre-/post-liminary work at a rate

commensurate with those found in each applicable CBA. Importantly, determination of whether

Plaintiffs are entitled to compensation at those respective rates requires this Court to interpret the

terms under the relevant CBA, prior to finding a violation of the FLSA. This is because the

CBA's only require payment of CBA rates for work "covered" by them. *See, e.g.*, the Local 175

CBA, Article II, p. 5; the Local 1010 CBA, Article II, p. 3.  Thus, in order to determine whether

Plaintiffs are entitled to CBA-scale rates, the Court would first have to determine whether the

pre-/post-liminary "work" Plaintiffs performed were sufficiently covered by the Local 1010

CBA (where applicable) or the Local 175 CBA (where applicable). This would require the Court

to analyze whether such services were services Local 175 intended be covered by the Local 175

CBA, or were services Local 1010 intended to be covered by that CBA.[22]

---

[21] It is also worth noting that while Patrick Labate was a foreman for NY Paving during times relevant to the
Complaint, he would give the driver of the truck an extra half hour of "work" time. Labate Dep. 191-18-193:09.

[22] In other words, the Court would need to analyze whether Plaintiffs were performing paving services befitting an
"Asphalt Paver" pursuant to Local 175's CBA, or whether Local 1010 Opt-Ins were performing paving services

Thus, Plaintiffs' Claims seeking payment for pre-/post-liminay work at CBA-scaled rates (as opposed to minimum wage) are preempted by Section 301 of the Labor Management Relations Act, and/or the National Labor Relations Act. *Tand v. Solomon Schechter Day School of Nassau County*, 324 F.Supp.2d 379, 383 (E.D.N.Y. 2004) (citation omitted); *see also, e.g.*, 29 U.S.C. § 185; *Nakahata v. New York-Presbyterian Healthcare System, Inc.*, 2011 WL 321186, *4 (S.D.N.Y. Jan. 28, 2011), *reversed on other grounds*, 723 F.3d 192 (2d Cir. 2016); *Hoops v. Keyspan Energy*, 822 F.Supp.2d 301, 306-07 (E.D.N.Y. 2011); *Johnson v. D.M. Rothman Co., Inc.*, 861 F.Supp.2d 326, 333 (S.D.N.Y. 2012).

## CONCLUSION

**WHEREFORE,** Defendant respectfully requests the Court grant its motion for decertification of the collective, and that Defendant be granted such other and further relief as the Court deems just and proper.

Dated:        Mineola, New York
               October 5, 2021

                                  **MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP**
Attorney of for Defendant
190 Willis Avenue
Mineola, New York 11501
nmelito@meltzerlippe.com

By:    **ECF**           /s/
                _____

                         Nicholas P. Melito

---

befitting a "Construction Utility Worker" pursuant to Local 1010's CBA. It is distinctly possible the alleged pre-/post-liminary "work" Plaintiffs performed is not work covered by CBA's, and instead consisted of duties which should have been performed by non-175/1010 employees (*i.e.* performing "driving" duties more befitting of a "Teamster," performing "cleaning" duties more befitting of a "Warehouseman," or performing ministerial/administrative duties more befitting support/administrative staff).

25